F I L E D
Clerk
District Court

DEC 31 2018

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| JERRY RAY, | Case No. 1:18-cv-00017 |
| Plaintiff, | |
| v. | **DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| VINCENT S. ATTAO, *et al.*, | |
| Defendants. | |

## I.     INTRODUCTION

In this prisoner civil rights action under 48 U.S.C. § 1983, Plaintiff Jerry Ray challenges the conditions of his confinement in the CNMI Department of Corrections (DOC)[1] as unnecessarily subjecting him to solitary confinement and isolation and failing to provide adequate mental health care, both in violation of the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishment. Defendant DOC officers ("Defendants") move for summary judgment on grounds that Ray failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995 (PLRA), Pub. L. No. 104-134, 110 Stat. 1321, *as amended,* 42 U.S.C. § 1997e *et seq.* Defendants assert that two DOC policies, promulgated by the Commissioner in 2007 without formal rulemaking, set forth current grievance and discipline procedures and require an inmate to

---

[1] There is also a Division of Corrections ("the Division") within the Department of Corrections. The acronym DOC will be used only to refer to the Department of Corrections.

administratively appeal adverse decisions, and that Ray failed to comply. Ray asserts that a 1991 grievance procedure, which was adopted after formal rulemaking when the Department of Public Safety had authority over corrections and which is still in the Northern Mariana Islands Administrative Code (NMIAC), is the only effective procedure and does not require administrative appeal before judicial review. For the reasons set forth in this decision, the Court finds that the administrative appeal described in the 2007 grievance policy is not an available remedy that Ray needed to exhaust, but that the appeal process for disciplinary sanctions was available and Ray failed to exhaust it and may not seek judicial review of those sanctions. The Court further finds that the 1991 DOC rules and regulations are unworkable in this case and are therefore unavailable to Ray.

## II. UNDISPUTED FACTS

Ray has been a prisoner and inmate of the CNMI Department of Corrections ("DOC") since 2012. (Complaint, ECF No. 1, ¶ 11.)[2] While held in DOC's POD 4C, Ray suffered various physical injuries, including a 3.5 mm cut over his right eye on August 23, 2014, a swollen right eye and bruises on his right ear and the upper left side of his head on August 11, 2015, multiple bruises to his face and ears on March 11, 2016, and "hematoma left distal arm and left wrist pain, small bone fragment" on February 12, 2017. (*Id.* ¶ 13.) Except for the few days from February 10–12, 2017, when Ray was moved to POD 2F, he remained in POD 4 until June 27, 2017. (*Id.* ¶ 14.)

Ray was given notice of disciplinary sanctions three times in 2016, twice in 2017, and once in

---

[2] Facts cited from the Complaint were admitted by Defendants in their Answer (ECF No. 9), unless otherwise noted.

2018; they were on July 14, 2016; July 19, 2016; October 20, 2016; February 12, 2017; September 8, 2017, and February 5, 2018. (Def. Ex. 6, ECF No. 21-5.) The notices include the following language: "You have the right to appeal this disciplinary sanction to the Director of Corrections within twenty-four (24) hours after receipt. If you are not satisfied with the Director's decision, you can appeal to the Commissioner of Corrections. If you are not satisfied with the Commissioner's decision, you can request the Commissioner to be heard by a committee." (*Id.*) Ray signed directly under the right-to-appeal advisement. (*Id.*) As Ray's counsel conceded at the motion hearing, Ray did not exercise his right to appeal any of these sanctions within 24 hours of receipt.

From about July 19, 2016, through June 27, 2017, Ray was held in administrative segregation. (*Id.* ¶ 15.)[3] On or about December 19, 2016, he requested relief from certain conditions of his confinement, and relief was denied.[4] In early January 2017, after requesting removal from and/or grieving his continued placement in administrative segregation, he was denied relief because he had not completed a three-tier step-down process. (*Id.* ¶ 18.) On or about February 10, 2017, after a meeting with Ray regarding threats against him and his requests to be taken out of POD 4C, he was moved to POD 2F. (*Id.* ¶ 19.) A few days later, on or about February 14, he was returned to POD 4.

---

[3] In ¶ 15, Ray asserts he was in solitary confinement as well as administrative segregation. In their Answer, Defendants "[d]enied" ¶ 15, but it appears they really only deny that Ray was in solitary: "The Department of Corrections lacks the facilities to actually put an inmate in 'solitary confinement' as it is commonly understood. At all times relevant to Plaintiff's complaint, Plaintiff was assigned to and resided in an ordinary cell in an ordinary 'pod' where ordinary prisoners are kept." (Answer ¶ 15.) Elsewhere, Defendants acknowledge that Plaintiff filed a grievance (¶ 17) and a request (¶ 18) to be removed from administrative segregation.

[4] The parties disagree on the details. Ray says he "requested to be taken out of full restraints and that request was denied by Defendant Cabrera." (Complaint ¶ 17.) Defendants say Ray "filed an administrative grievance to be removed from administrative segregation" and that the grievance was denied. (Answer ¶ 17.)

(*Id.* ¶ 20.) On or about April 24, 2017, NMPASI requested Defendants' assistance in addressing Ray's need for psychiatric care. (*Id.* ¶ 22.)

On or about July 27, 2017, Ray cut himself. (*Id.* ¶ 23.) At the time, he suffered from high blood pressure, an open arm wound, agitation, and multiple self-inflicted wounds. (*Id.* ¶ 24.) A counselor at DOC recommended Ray be taken to the local hospital, the Commonwealth Healthcare Corporation ("CHCC") for psychiatric evaluation due to his attempts at self-harm and his having hallucinations. (*Id.* ¶ 25.) He was treated at CHCC and released back to DOC. (*Id.* ¶ 26.)

On or about July 30, 2017, Ray submitted a sick leave request claiming he was hallucinating, hearing voices, and felt like hurting himself. (*Id.* ¶ 28.) An appointment was scheduled for him to be seen at the Family Care Clinic (FCC) on August 2. (*Id.* ¶ 29.) The parties agree he was seen at CHCC around that time and prescribed medication for hallucinations, but do not agree on whether he was seen at FCC or the emergency room, whether a psychiatric evaluation was recommended, and whether he was provided the prescribed medication. (Complaint and Answer ¶ 31.)

On or about January 12, 2018, Ray was granted telephone privileges and 30-minute noncontact visitations because he had been in compliance since his last sanction on September 8, 2017. (Complaint ¶ 33.) Less than a month later, on or about February 5, 2018, he was again restricted to his cell for 60 days and denied privileges. (*Id.* ¶ 34; Feb. 5, 2018 Disciplinary Sanction, ECF No. 21-5 at 11.) On or about May 7, 2018, restrictions were removed and privileges restored. (*Id.* ¶ 36.) However, he remains subject to isolation and confinement in his cell and has requested that he be assigned to a cell in "open bay" to alleviate his anxiety and further deterioration of his mental health. (*Id.* ¶ 37). Defendants deny this allegation. (Answer ¶ 37, ECF Nos. 3 and 9.)

### III. LEGAL STANDARD

On a Rule 56 motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court is limited to determining whether a genuine dispute exists, and does not weigh the evidence or make credibility determinations. *Zetwick v. County of Yolo,* 850 F.3d 436, 441 (9th Cir. 2017) (citing *Tolan v. Cotton,* 572 U.S. 650, 656 (2014)). "[T]he district court must recognize that, where evidence is genuinely disputed on a particular issue— such as conflicting testimony—that 'issue is inappropriate for resolution on summary judgment.'" *Id.* (quoting *Direct Techs, LLC v. Elec. Arts, Inc.* 836 F.3d 1059, 1967 (9th Cir. 2016)).

The moving party bears the initial burden of identifying "particular parts of materials in the record" that "demonstrate the absence of a genuine issue of material fact." Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When the moving party also bears the burden of persuasion at trial, to prevail on summary judgment it must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Shakur v. Schriro,* 514 F.3d 878, 890 (9th Cir. 2008) (internal quotation omitted). "Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 531 (9th Cir. 2000) (citing *Celotex,* 477 U.S. at 323–24, and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Under the PLRA, non-exhaustion is an affirmative defense that is properly raised in a motion for summary judgment. *Albino v. Baca,* 747 F.3d 1162, 1169 (9th Cir. 2014). If there is a genuine dispute of fact material to whether available administrative remedies were exhausted, summary

judgment will be denied. *Id.*

## IV.   DISCUSSION

1.  <u>Defense of Exhaustion of Administrative Remedies</u>

Defendants move for summary judgment on the grounds that Ray failed to exhaust administrative remedies before filing this lawsuit, as required under the PLRA. (MSJ Memo. at 1.) They maintain that Ray "failed to properly utilize DOC's available grievance system." (*Id.* at 2.) They assert that Ray was obligated to appeal DOC sanctions and DOC denials of his grievances internally, and that he did not do so. In their view, the grievance and discipline procedures that DOC adopted in 2007, DOC Policy No. 3.5.2 (Ex. 3, ECF No. 21-2) and Policy No. 3.3.1 (Ex. 5, ECF No. 21-4), are binding on Ray, even though they were not adopted as regulations pursuant to the Commonwealth Administrative Procedures Act (CAPA).

Part F (Grievance Board) of Policy No. 3.5.2 states:

> In the event a grievance cannot be resolved to the inmate's/detainee' s
> satisfaction, the aggrieved inmate/detainee may appeal to the Commissioner
> using the Inmate/Detainee Grievance form. The Commissioner will review the
> grievance report and determine appropriate action to be taken. The
> Commissioner may convene a three (3) member board to resolve the matter. . . .
> In the event the inmate/detainee is still not satisfied with the Board's decision,
> he/she may resort to the courts.

(Ex. 3, at 4.) Paragraph 3 of section I (Written Notice to Impose Sanctions) of Policy No. 3.3.1 states:

> The written notice shall state that he/she has a right to appeal the proposed
> sanction to the Director of Corrections within twenty four (24) hours from the
> time inmate/detainee received the proposed sanction. The Director of
> Corrections will either affirms or reverses [*sic*] the decision of the Captain of
> Operations within five days of the appeal.

(Ex. 5, at 9.) And paragraph 1 of section J provides that after the Commissioner review's the Director's

decision, if the inmate or detainee is "still not satisfied, [he or she] may appeal the decision and request a hearing in front of the Disciplinary Committee . . ." (*Id.*) "The appeal to the Disciplinary Committee shall be the final administrative remedy." (*Id.,* sec. J(7).)

Ray asserts that the controlling procedures are not those set forth in DOC's policy statements but the ones codified in title 57 (Department of Corrections) of the Northern Mariana Islands Administrative Code (NMIAC). Title 57 does not require administrative appeal before judicial review of administrative action on a grievance:

> Grievances are normally forwarded to the Chief of Corrections, who then investigates the complaint. The Chief will then institute whatever action is necessary to rectify the situation within one week of the receipt of the grievance. The Chief of Corrections provides the prisoner with a written response regarding the disposition of the grievance. If the prisoner feels that the response is insufficient, he has recourse to legal action in the court through his attorney should the attorney feel there are sufficient grounds for legal action.

NMIAC § 57-20.1-710. Alternatively, Ray maintains that he effectively exhausted his administrative remedies with respect to grievances filed on December 19, 2016, February 14, 2017, and March 8, 2017 (ECF No. 21-6 at 3–4, 8–11) under Policy No. 3-5-2 because the Commissioner or the Commissioner's designee "reviewed the grievance and determined the action to be taken." (Opp'n at 10, Oct. 29, 2018, ECF No. 22.)

As to appeal of disciplinary sanctions for minor offenses such as Ray's, the Administrative Code permits an inmate to appeal "by signing a written request within 24 hours of the receipt by the inmate of the notice [of sanction]." NMIAC § 57-20.1-630(b)(1)(iv). At the motion hearing, Ray conceded that he had not signed such a request within 24 hours.

Although the parties dispute many of the facts concerning the conditions of Ray's confinement

– especially whether he was ever in solitary confinement – these disagreements are not material to determining Defendants' motion for summary judgment. The only material issue at this stage of the litigation is whether Ray exhausted administrative remedies. In order to answer that question, one must understand the history of corrections policy in the CNMI, the exhaustion requirements of the PLRA, and any limitations that the CAPA may put on DOC policymaking.

2.   The Consent Decree and the Formation of DOC

The First Commonwealth Legislature placed responsibility for pretrial detention and the incarceration of offenders in the Department of Public Safety ("DPS"). Pub. L. 1-8, ch. 10, sec. 3(c) (Aug. 4, 1978); 1 CMC § 2501 (1999) ("There is in the Commonwealth government a Department of Public Safety, composed of a police force, a fire service and a corrections service."); 1 CMC § 2504(c) (1999) (listing among DPS duties to "manage facilities for persons accused of crimes pending trial and to provide correctional training for the rehabilitation of those persons sentenced to prison"). DPS was given authority to "adopt rules and regulations regarding activities over which the department has jurisdiction." 1 CMC § 2507 (1999). Pursuant to that authority, in 1991 DPS adopted rules governing its Division of Corrections. 13 Com. Reg. 8072 (Oct. 15, 1991), NMIAC 57-20 (Subchapter History). Those rules are still in the NMI Administrative Code, at Part 700 of Title 57.

In 1999, in this Court, the United States brought an action against the Commonwealth, under the Civil Rights of Institutionalized Persons Act of 1980, for allegedly "failing to protect inmates" in CNMI prisons and jails "from undue risk of harm by, *inter alia,* failing to provide adequate supervision, … adequate security, … adequate inmate classification, … adequate medical and mental health care, and ... adequate environmental health, sanitation, and fire safety." *United States v. CNMI,*

No. 1:99-cv-00017, Complaint, Feb. 23, 1999, ECF No. 1. The parties entered into a Consent Decree in which the Commonwealth agreed to develop a short-term and long-term plan to address those concerns. *Id.,* Consent Decree ¶ 9, Feb. 25, 1999, ECF No. 4. The focuses of the Consent Decree were fire safety (Part III), sanitation (Part IV), medical care (Part V), security and protection from harm (Part VI), and new construction (Part VII). The Consent Decree did not specifically address grievance and sanctions procedures.

In 2004, the Commonwealth enacted Public Law 14-25, which "transferred all responsibility for correctional and detention facilities from the Department of Public Safety (DPS) and the Office of the Attorney General's (AGO) Division of Immigration to the newly created Department of Corrections." NMIAC 57-20 (Commission Comment). The reorganization was largely in response to the Consent Decree. Pub. L. 14-25 sec. 1 (Findings). It created three divisions within the new department: the Division of Pre-trial Detention, the Division of Civil Detention, and the Division of Corrections. 1 CMC § 2853. It expressly vested rulemaking authority in the Secretary – later amended to Commissioner – of the Department of Corrections. "The Commissioner shall prescribe reasonably necessary rules and regulations to implement and enforce the provisions of this chapter for the entire department including its divisions." 1 CMC § 2854 (amended by Public Law 15-51 (2007) to change "Secretary" to "Commissioner").

In December 2007, DOC adopted Policy No. 3.5.2 on inmate/detainee grievance procedures (Ex. 3, ECF No. 21-2) and Policy No. 3.3.1 on inmate prohibited acts and discipline (Ex. 5, ECF No. 21-4). Both documents are signed by the Director of Corrections and the Commissioner of Corrections and set forth a process for internal administrative appeal.

The two policies are not part of the NMI Administrative Code, and Defendants concede they were not promulgated by the procedures set forth in the CAPA, 1 CMC § 9101 *et seq.* (Reply, at 4.) They were submitted to the Court, along with 135 other DOC policy statements, as exhibits (ECF Nos. 31-81 and 31-84) attached to the CNMI's April 2008 status report under the Consent Decree. *United States v. CNMI,* Quarterly Status Report, Apr. 2, 2008, ECF No. 31. The Court did not issue an order approving the status report or any of the attached policies.

In January 2014, the United States and the CNMI jointly moved to terminate the Consent Decree. *United States v. CNMI,* Joint Motion to Terminate Consent Decree, Jan. 27, 2014, ECF No. 61. In the joint motion, the parties detailed the many actions the Commonwealth had taken to comply fully with the Consent Decree; improvement of grievance and discipline procedures was not one of them. *Id.* On May 20, 2014, the Court granted the motion and dissolved the Consent Decree. *Id.,* Order, ECF No. 67.

3.  Validity of NMI Administrative Code Regulations on Prisoner Grievance and Discipline Procedures

Defendants' position is that after the 2004 reorganization that stripped DPS of control of corrections, the prisoner grievance procedure adopted by formal rulemaking as a DPS regulation no longer had any legal effect and is not binding on today's DOC. (Reply, at 3, Nov. 8, 2018, ECF No. 23.) They maintain that the 2007 policies are legally binding grievance and sanction procedures, and that 1 CMC § 2854 (2004, as amended) gives the Commissioner the power to prescribe them without formal rulemaking. (Reply, at 4.)

Public Law 14-25 states as its purpose to "allocate and *transfer* the responsibility for

correctional and detention functions" to the new executive Department of Corrections. Pub. L. 14-25, sec. 2 (emphasis added). The transfer of records, property and personnel, and funds from the old Division of Corrections to DOC is expressly addressed in Section 5 ("Transition") of the law, but Section 5 is silent as to the transition of existing corrections regulations. *Id.,* sec. 5. If the disciplinary and grievance regulations are not expressly transferred, neither are they expressly repealed. Rather, the law's savings clause states that existing rights acquired "under any rule, regulation or order adopted under the [repealed] statutes" are unaffected by the reorganization. *Id.,* sec. 7. The implication is that to the extent practicable, existing regulations remain in force until new ones are adopted. Thus, the text of Public Law 14-25 does not support a finding that it invalidated Division of Corrections regulations wholesale.

Defendants maintain that the NMIAC prisoner grievance procedure must no longer be valid because it refers to offices that no longer exist and entities that no longer have authority over corrections. (Reply, at 4–5.) For example: "Prisoners have the right to present grievances to the Chief of Corrections, the Director of Public Safety, and the Attorney General." NMIAC § 57-20.1-701. Defendants suggest that if this is the operable regulation, Ray has failed even to start the grievance process, because the positions of Chief of Corrections and Director of Public Safety no longer exist and Ray did not address any grievance to the Attorney General. (Reply, at 5.)

Defendants make a fair point. Although the regulation does not say that grievances may *only* be made to the Chief of Corrections, the Director of Public Safety, and the Attorney General, the grievance procedure it outlines depends on the existence of those officers. "Grievances are normally forwarded to the Chief of Corrections, who then investigates the complaint." NMIAC § 57-20.1-710.

"Grievances against the Chief of Corrections or the Director of Public Safety are forwarded directly to the Attorney General's office who will be asked to investigate the matter." NMIAC § 57-20.1-725. Perhaps the regulation could be saved by severing the extraordinary procedure for grieving the Chief or the Director directly to the Attorney General, leaving intact the process for routine grievances to the Chief of Corrections. But then what current officer should be understood to stand in the shoes of the defunct Chief? The DOC Commissioner? The Director of the Division of Corrections? And by what rule of law is the substitution to be made? The same problems plague the Administrative Code's disciplinary procedure for minor offenses, which provides for appeal of disciplinary action to the Chief of Corrections. NMIAC § 57-20.1-630(b). No answer to these questions having been found, the Court is compelled to find that these regulations are unworkable, unenforceable and – most important, as we will see shortly – unavailable. Ray cannot rely on them to show that he has exhausted administrative remedies.

    4.   <u>Availability of DOC Policy No. 3.3.1 and No. 3.5.2</u>

    Just because Title 57 of the NMI Administrative Code no longer sets forth valid discipline and grievance procedures does not automatically mean that the policies DOC adopted in 2007 determine whether Ray exhausted administrative remedies.

    The PLRA states, "No action shall be brought with respect to prison conditions under section 1983 of this title [title 42], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Jones v. Bock,* 549 U.S. 199, 211 (2007). The PLRA does not prescribe how such remedies are to be enacted. *See, e.g., Concepcion v. Morton,* 306 F.3d 1347 (3rd

Cir. 2002) (validating informal grievance procedure promulgated by prison warden rather than administrative agency). But it does provide the "one significant qualifier" that "the remedies must indeed be 'available' to the prisoner." *Ross v. Blake,* __ U.S. __, 136 S.Ct. 1850, 1856 (2016).

The key question under the PLRA is availability. "An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Ross,* 136 S.Ct. at 1858. "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth v. Churner,* 532 U.S. 731, 738 (2001)). *See Rodriguez v. County of Los Angeles,* 891 F.3d 776, 792 (9th Cir. 2018) ("a prisoner is excused from the exhaustion requirement in circumstances where administrative remedies are effectively unavailable"). In at least three circumstances, an administrative remedy on paper will not be deemed available: (1) when it "operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the mechanism to obtain relief is "so opaque" that "no ordinary prisoner can discern or navigate it"; and (3) when "prison administrators thwart inmates from taking advantage of a grievance procedure through machination, misrepresentation, or intimidation." *Ross,* 136 S.Ct. at 1859–60.

Ray has not argued that the remedies set forth in the two DOC policies governing disciplines and grievances are unavailable. He does assert, however, that in the event the Court finds the policies applicable, he satisfied the grievance procedures when Acting Commissioner Cabrera made a decision on his three complaints. (Opp'n at 10.) From the evidentiary record submitted by the parties, administrative appeal of disciplinary sanctions was clearly available to Ray. In conformity with Section I of Policy No. 3-3-1, Ray was given written notice of intent to impose sanctions; the notices

stated his right to appeal in writing within 24 hours of their receipt; and Ray signed the notices. It is uncontested that Ray did not appeal the sanctions in writing.

Ray's grievances are another matter. The Inmate Grievance form has a space at the bottom for "Instructions," which DOC officers used to write their responses to Ray's grievances. No other written responses were provided. The form does not include any language advising Ray of a right or means to appeal the officer's decision. Nor do DOC officers mention that appeal is available in their handwritten responses to Ray's grievances of December 19, 2016; January 6, 2017; February 14, 2017; March 8, 2017; March 16, 2017; and April 25, 2017 (ECF No. 22-2, at 1, 5, 6, 8, 10, and 13.) There is no evidence that Ray or other inmates were given a prison handbook. Defendants have submitted booking sheets and other documents that Ray received upon intake to DOC. (ECF No. 21-1.) None of these show that Ray was informed of DOC's grievance procedure or a right to appeal an adverse decision on a grievance. On the Arrestee Intake Checklist (ECF No. 21-1, at 6), Ray acknowledged that he had been "properly informed of all Department of Correction Rules and Regulations before being detained, and understand them all." However, the "Department of Correction Rules and Regulations" were not submitted as an exhibit, and Defendants have not pointed to a source where those rules and regulations are gathered and accessible. Nor does it appear that Ray or any other inmate is in a position to know whether he has really been properly informed of *all* the rules and regulations. More specifically, Ray acknowledged receiving the Inmate Housing Pod Rules and Regulation. Among the documents Ray received on intake and signed was one titled Inmate Orientation and Housing Pod [R]ules. (ECF No. 21-1, at 10.) This document does not in any manner address inmates' right to grieve or the process by which a grievance shall be made and decided.

The only evidence that Ray had notice of a right to appeal an adverse determination of a grievance is Director Georgia Cabrera's declaration that she personally spoke with Ray about his December 19, 2016 grievance and that "if he was unhappy with the result of the grievance he could appeal." (Cabrera Declaration, Oct. 18, 2018, ECF No. 20 ¶ 24.) Assuming this to be true, the means for Ray to appeal were at best opaque. Section F of Part III of Policy No. 3.5.2 states, "In the event a grievance cannot be resolved to the inmate's/detainee's satisfaction, the aggrieved inmate/detainee may appeal to the Commissioner using the Inmate/Detainee Grievance form." (ECF No. 21-2, at 4.) The Inmate Grievance Form has no box to check or other place for the inmate to indicate that he or she is appealing an adverse decision on a prior grievance rather than filing a new grievance. After reviewing the grievance report, the Commissioner "*may* convene a three (3) member board to resolve the matter." (*Id.* (emphasis added).) The convening of a board is at the Commissioner's discretion; it is not another step that an inmate must take to exhaust administrative remedies. Moreover, the December 16, 2016 grievance was addressed by Ray directly to Cabrera, who at the time was Acting Commissioner; Cabrera signed off on the grievance as "Dis/Approved by: Commissioner" ("Dis" is handwritten in). Cabrera did not refer the grievance to a subordinate officer for decision. She wrote the decision ("You will start the stepdown process; Based on policy. Please continue your good behavior, eventually you will be out of Admin Segregation") in her own hand and signed her name afterward. No higher authority to appeal to is apparent.

On this evidentiary record, the Court finds that the administrative remedy for grievances set forth in Policy No. 3.5.2 was so opaque that an ordinary prisoner like Ray could not be expected to navigate it. Additionally, as Ray argues, because there is no form specifically for appeals, the Court

construes Ray's subsequent use of the generic grievance form directed to the Commissioner as his appeal that was acted upon. (Opp'n at 12.)

    5.  <u>Validity of DOC Policy No. 3.3.1 and 3.5.2</u>

Ray asserts that the 2007 DOC policy statements have no force because they are not rules and regulations promulgated in accordance with the Commonwealth Administrative Procedures Act. (Opp'n, at 7.)

Not every policy of a CNMI government agency has to go through formal notice-and-comment rulemaking. The CAPA excepts from the definition of "rule" subject to formal rulemaking "[s]tatements concerning only the internal management of an agency, including, but not limited to, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, paper and property and not affecting private rights to procedures available to the public[.]" 1 CMC § 9101(m)(1).[5] Commonwealth law vests in the DOC Commissioner broad authority to "prescribe reasonably necessary rules and regulations[.]" 1 CMC § 2854. Unlike the enabling laws for correctional agencies in some states, however, the CNMI does not expressly require that such rules be adopted by means of formal rulemaking. *Cf., e.g.,* Maine, Me St. T. 34-A § 1402(3)(A) (requiring commissioner to follow Maine APA in establishing rules concerning function of correctional facilities and programs); Utah, Ut. St. § 64-13-10 (calling on corrections department to make rules in accordance with Utah Administrative Rulemaking Act); California, Cal. Penal Code §

---

[5] Also excepted are certain declaratory rulings, intra-agency memoranda, and Attorney General opinions, but those clearly do not apply here.

5058 (requiring formal rulemaking for all rules and regulations affecting prisoners except for pilot programs and in emergencies); *see* Giovanna Shay, Ad Law Incarcerated, 14 Berkeley J. Crim. L. 329, 346–47 nn. 133, 134 (Fall 2009) (surveying state law on rulemaking in corrections departments).

On the other hand, Commonwealth law does not expressly exempt DOC from all formal rulemaking. Policy statements that concern "only the internal management" of DOC will be exempted by operation of 1 CMC § 9101(m)(1). The courts in some states that give the corrections commissioner broad rulemaking authority have found that the "internal management" exception of their state's APA reaches far and wide. For example, the Hawaii Supreme Court found clear support in the legislative history of the Hawaii APA in determining that state corrections policy governing the transfer of inmates did not have to go through formal rulemaking. *Tai v. Chang,* 570 P.2d 563 (Haw. 1977). In Connecticut, the policy concerning the screening of inmate mail for sexually explicit material did not have to go through formal rulemaking because it was merely an "administrative directive" which Connecticut statutes gave the commissioner authority to establish. *Pierce v. Lantz,* 965 A.2d 576, 580 (Conn. App. 2009) (citing Conn. Gen. St. § 18-81 ("The commissioner shall establish rules for the administrative practices and custodial and rehabilitative methods of said institutions and facilities in accordance with recognized correctional standards.")).

Other states, however, have reached a different conclusion. The Michigan Supreme Court rejected the position that prison disciplinary rules affecting only inmates do not affect the rights of the public and therefore need not go through formal rulemaking. *Martin v. Dept. of Corrections,* 384 N.W. 2d 392 (Mich. 1986). It observed that public concern for humanitarian and civil rights of prisoners belied the government's view that public comment would be of little benefit. *Id.* at 395–96.

Maryland's highest court reached a similar conclusion, after a more thorough analysis than the Michigan court gave the issue, in *Massey v. Secretary, Department of Public Safety and Correctional Services,* 886 A.2d 585 (Md. 2005). The Maryland court found that a series of detailed "directives" of the state corrections department defining administrative offenses, prescribing discipline, and establishing procedures to adjudicate inmate complaints had to be "adopted in conformance with the State Administrative Procedure Act[,]" and that because they were not, the directives were ineffective. *Massey,* 886 A. 2d at 586–87. Section 3-205 of the state's Correctional Services Article (CS) authorized the commissioner to adopt regulations providing for inmate discipline, but did not exempt it from the Maryland APA. *Id.* at 587. Inmate Massey challenged the legality of discipline to which he had been subjected on grounds that the pertinent directives, not having been adopted through formal rulemaking, were unlawful. *Id.* at 591. The state defended by asserting that the directives concerned only internal management of the corrections department and correctional facilities, and did not affect the rights of the public or procedures available to the public. *Id.* at 592. "The State's position is that the Secretary's directives govern how DOC maintains order and manages the inmate populations, which are matters of internal management for which great flexibility is required." *Id.* Massey pointed out that "the directives do a great deal more than that—that they define both the substantive and procedural construct under which inmates may have their incarceration extended and thus affect Constitutionally-protected liberty interests." *Id.* The court found that the nature and history of the directives shows they "are *not* merely guidelines pertaining to internal management, routine or otherwise." *Id.* at 594 (original emphasis). It concluded that the directives were ineffective despite the fact that the disciplinary and grievance procedures had been developed in response to a federal consent

decree and incorporated in district court's final order. "Perhaps the Secretary [of the Department] and the Commissioner [of the Division of Corrections] assumed that, as the procedures formed part of a Federal court order, it was not necessary to comply with State statutory requirements, minimal though they were." *Id.* at 597. The court found the fact that the directives "proceeded from, and were designed to implement, basic Federal due process requirements is powerful evidence that they are not merely guidelines for routine, or even non-routine, internal management, subject to change at the whim of the Secretary or the Commissioner. At least where discipline may serve to lengthen an inmate's period of incarceration or subject an inmate to other 'atypical' punishment, regulations of that kind are required to protect the Constitutionally-based liberty interest of prisoners." *Id.* The court observed that whereas some states had adopted statutory language expressly extending the "internal management" exclusion to policies concerning inmates, the Maryland legislature had declined to do so. *Id.* at 599–600.

The *Massey* court's analysis is powerful and persuasive. Prisoners are a segment of the public. Procedures touching on their core due-process liberty rights do not comfortably fit within a common-sense definition of "internal management." The Commonwealth legislature has not exempted DOC from the operation of the CAPA. Section 2804 of Title 1 of the Commonwealth Code, granting the DOC Commissioner the authority to prescribe "reasonably necessary rules and regulations," does not exempt DOC from the operation of the CAPA. The two statutes (the CAPA and the DOC enabling law) can be harmonized by reading section 2804 to give the Commissioner authority to prescribe rules and regulations pertaining to the internal management of DOC, no more and no less.

Defendants claim that when Public Law 14-25 created a new Department of Corrections and stripped DPS of authority over corrections without transferring existing regulations to the new DOC,

the formal grievance rules codified at NMIAC § 57-20 no longer had the force of law. (Reply, at 3–4.) There are several problems with this claim. First, the Law Revision Commission did not regard section 57-20 as obsolete when it included it in its 2004 edition, made after Public Law 14-25 went into effect. That edition contains "all permanent administrative rules in effect on December 31, 2004, adopted by agencies pursuant to the Administrative Procedure Act . . ." NMIAC, foreword to 2004 edition, p. xv. Section 57-20 is still on the books. Second, the rulemaking authority that DPS had under Public Law 1-8 was at least as broad as that conferred on the DOC Commissioner by Public Laws 14-25 (creating DOC) and 15-51 (changing "Secretary" to "Commissioner"). "The Department of Public Safety shall adopt rules and regulations regarding activities over which the Department has jurisdiction." Pub. L. 1-8, ch. 10, sec. 7. *Cf.* Pub. L. 14-25, ch. 14, art. 1, sec. 2804 ("The Secretary shall prescribe reasonably necessary rules and regulations to implement and enforce the provisions of this Chapter for the entire Department including its divisions.") If DPS had to comply with the CAPA in adopting formal grievance rules in 1991, so does the DOC Commissioner have to now. Third, Defendants have no legal basis to assert that DOC is not bound by DPS's regulation. (Reply, at 3.) The terms of Public Law 14-25, as discussed earlier, show that the legislature intended a smooth transition and did not intend to leave inmates and correctional officers unregulated until the new Secretary/Commissioner of Corrections got around to promulgating new rules.

The fact that the new, uncodified grievance and discipline policies were developed under the umbrella of the Consent Decree does not change the outcome. The United States' complaint that led to the Consent Decree did not claim inadequate grievance procedures. It alleged "a pattern or practice of failing to protect inmates . . . from undue risk of harm by, *inter alia,* failing to provide adequate

supervision, . . . adequate security, . . . adequate inmate classification, . . . adequate medical and mental health care, and . . . adequate environmental health, sanitation, and fire safety." Complaint, 99-CV-00017, Feb. 23, 1999, ECF No. 1. New grievance and disciplinary procedures were adopted pursuant to paragraph 54 of the Consent Decree's call for the CNMI to "develop comprehensive facility policies and procedures" for all correctional facilities. Consent Decree, 99-CV-00017, Feb. 25, 1999, ECF No. 4 (cited in MSJ Memo., at 4). The focus of that paragraph, however, was on "supervising inmates of different classifications" (¶ 54) and "training for correctional officers" (¶ 12(e), referencing ¶ 54). Furthermore, the Consent Decree expressly was "not intended to have any preclusive effect except between the parties." (Consent Decree ¶ 7.) Although under the Consent Decree the United States and the district court had a right and duty to review and approve new policies, nothing in the Consent Decree overrode the CAPA or otherwise freed DOC from complying with CNMI law in putting the new policies into effect.

In the motion hearing, Defendants for the first time cited *Creech v. Reinke,* No. 1:12-cv-00173, 2012 WL 1995085, at *5 (D. Idaho June 4, 2012), in support of their position. Richard Leavitt was on Idaho's death row. (Creech was a codefendant who was not involved in this part of the litigation.) Leavitt asserted that Idaho's death protocol violated the Eighth Amendment. Idaho's corrections department defended on grounds that Leavitt had failed to exhaust administrative remedies set forth in internal procedure documents. Leavitt did not dispute that he had not fully availed himself of the prison's internal administrative procedures but asserted that challenges to death protocols are not subject to the exhaustion requirement of 42 U.S.C. 1997e. *Creech*, 2012 WL 1995085, at *5. After determining that exhaustion was required for lethal-injection challenges, *id*. at *9, the district court

analyzed whether the Idaho corrections department procedure was "available" as required by section 1997e(a). *Id.* at *10. In finding in favor of the state and against Leavitt, the court observed that the Idaho legislature had specifically delegated authority for carrying out death sentences to Idaho DOC. *Id*. at *10. It accepted without question the validity of the corrections department procedure.

Leavitt did not challenge the authority of Idaho's corrections department to set procedures without formal rulemaking, nor did the court do so on its own. The Idaho APA (chapter 52 of title 67 of the Idaho Code), unlike the Commonwealth APA, expressly excludes the state corrections board from its definition of "agency." Idaho Code Ann. sec. 67-5201(2). Thus, *Creech* is not on point.

For these reasons, if Ray had brought an action directly challenging the enforceability of DOC policies against him, as the Maryland inmate did in *Massey,* a court might well rule in his favor. In *Massey,* the inmate submitted an internal Request for Administrative Remedy to the prison warden, in which he challenged the validity of a sanction imposed pursuant to an informal rule of the corrections department. *Massey,* 886 A.2d at 590. His request was denied and he appealed it administratively. *Id.* Only when he had exhausted administrative appeals did he bring suit in the Maryland courts. *Id.* at 591.

The focus of the PLRA, in contrast, is the availability of administrative remedies, not how they were developed and whether they were promulgated in accordance with state law. As the Third Circuit observed, "we think it justified to assume from the PLRA amendments that Congress did not intend for courts to expend scarce judicial resources examining how and by whom a prison's grievance procedure was implemented." *Concepcion,* 306 F.3d at 1354. The sanctions appeal procedure that DOC adopted was clear enough. Ray had written notice of his right of appeal and the means to appeal,

which he acknowledge by his signature. An administrative appeal of his disciplinary sanctions was available, and he failed to avail of it.

## V. CONCLUSION

The Department of Corrections' process for administrative appeal of grievances pursuant to Policy No. 3.5.2 is opaque and therefore unavailable to Ray, but its process for administrative appeal of disciplinary sanctions pursuant to Policy No. 3.3.1 is clear and available. The DOC Rules and Regulations promulgated under the Commonwealth's Administrative Procedures Act by the Department of Public Safety in 1991 are unworkable and effectively unavailable to Ray. For these reasons, the Court finds that Ray exhausted administrative remedies with respect to his grievances, but not with respect to sanctions. Therefore, the Court DENIES Defendants' motion for summary judgment as to judicial review of Ray's grievances but GRANTS it as to sanctions.

SO ORDERED this 31st day of December, 2018.


_____
RAMONA V. MANGLONA
Chief Judge